AO 106 (Rev. 04/10)  Application for a Search Warrant



E-FILED
Friday, 04 May, 2018 03:36:33 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT

for the
Central District of Illinois

FILED

MAY – 4 2018

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Information associated with electronic mail account
"illinoispatriot@protonmail.com"

)
)
)
)
)
)

Case No.  18-MJ- 7089

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, which is attached hereto and specifically incorporated herein by reference.

located in the _____Central_____ District of _____Illinois_____ , there is now concealed *(identify the person or describe the property to be seized):*
or will be concealed, information associated with the ProtonMail account "illinoispatriot@protonmail.com", items described in Attachment B, which is attached hereto and specifically incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§844, 922(o), 924 (c), 1951, 371, 241, 247, and 248. | Arson, possession of a machinegun, using a destructive device, robbery, conspiracy against rights, damage to religious property/reproductive health clinic |

The application is based on these facts:

See affidavit of FBI Special Agent Barbara Robbins

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Barbara Robbins

*Applicant's signature*

Barbara Robbins, FBI Special Federal Officer
*Printed name and title*

Sworn to before me and signed in my presence.

s/Eric I. Long

Date:  _____05/04/2018_____

*Judge's signature*

City and state:  Urbana, IL

Eric I. Long, United States Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

<u>PROPERTY TO BE SEARCHED</u>

Information from the ProtonMail account "illinoispatriot@protonmail.com"
downloaded to computer media in possession of the Federal Bureau of Investigation
located in the Central District of Illinois (the "Subject Account Information").

1

## ATTACHMENT B

### ITEMS AND INFORMATION TO BE SEIZED

Any and all items and information from the ProtonMail account

"illinoispatriot@protonmail.com" that relate to violations of Title 18, United States

Code, Sections 844(i) (Arson and Attempted Arson), 844(h) (Use of an Explosive), 924(c)

(Using a Destructive Device During a Violent Crime), 1951 (Conspiracy to Commit

Robbery and Extortion), 922(o) (Possession of a Machinegun), 371 (Criminal

Conspiracy), 241 (Conspiracy Against Rights), 247 (Damage to Religious Property), and

248 (Damage to a Reproductive Health Clinic), including, but not limited to:

a.   Any information recording the account owner's schedule and travel from July 1,

2017, to the present;

b.   Evidence indicating the email account owner's state of mind as it relates to the

crime under investigation;

c.   Evidence of potential future bombing targets and the motive for targeting those

locations;

d.   Evidence that communications described in this warrant were created, edited, or

deleted;

e.   Evidence of communications meant to obstruct law enforcement's investigation

into the violations referenced above; and

1

f.  The identity of the person(s) who may have communicated with the ProtonMail account "illinoispatriot@protonmail.com" about matters relating to the violations referenced above, including records that help reveal their whereabouts.

2

# A F F I D A V I T

I, Barbara Robbins, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.      I am a Detective Sergeant with the University of Illinois Police Department (UIPD) and have been so employed for approximately 21 years. In addition, I have been assigned as a Special Federal Officer to the Federal Bureau of Investigation (FBI), Joint Terrorism Task Force (JTTF), for the last five years. My duties with the FBI include investigating criminal violations of the United States Code, including violent crimes, domestic terrorism, and bombings within the United States. I maintain multiple duties with the UIPD as well, including security detail for high level officials visiting the University of Illinois. I have extensive experience in executing search warrants and arrest warrants, interviewing witnesses, subjects, and targets, and seizing evidence.

2.      This affidavit is made in support of an application for a search warrant pursuant to Rule 41(b)(1) and (b)(3) of the Federal Rules of Criminal Procedure to search for and seize evidence of violations of one or more of Title 18, United States Code, Sections 844(i) (Arson and Attempted Arson), 844(h) (Use of an Explosive), 924(c) (Using a Destructive Device During a Violent Crime), 1951 (Conspiracy to Commit Robbery and Extortion), 922(o) (Possession of a Machinegun), 371 (Criminal Conspiracy), 241 (Conspiracy Against Rights), 247 (Damage to Religious Property), and 248 (Damage to a Reproductive Health Clinic), specifically those items more fully set forth in Attachment B of this affidavit, which is attached hereto and incorporated herein

by reference. These items are believed to be contained in information associated with the "illinoispatriot@protonmail.com" account, which is currently believed to be stored on ProtonMail servers in Switzerland, but is anticipated to be downloaded to computer media in possession of the FBI in the Central District of Illinois (the "Subject Account Information"). This location is more fully described in Attachment A of this affidavit, which is attached hereto and incorporated herein by reference.

3.      The statements in this affidavit are based in part on my own investigation, as well as on information provided to me by other law enforcement officers, on information provided by other witnesses, and on my own experience, training, and background as a police officer and Special Federal Officer. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 844(i), 844(h), 924(c), 1951, 922(o), 241, 247, and 248 will be located in the Subject Account Information at the time the warrant is executed.

## DEFINITION OF TERMS

4.      The following terms have the indicated meaning in this affidavit:

     a.    "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile

phones and devices. *See* 18 U.S.C. § 1030(e)(1). "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

b.　　"Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

c.　　The term "email" (electronic mail) is defined as the text messages sent from one person to another via a computer, which may include images. Email can also be sent automatically to a large number of addresses via a mailing list.

d.　　The term "Internet" is defined as the worldwide network of computers, a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide. The Internet is not an online service and has no real central hub. It is a collection of tens of thousands of computer networks, online services, and single user components. In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

e.     The term "Internet Protocol Address" or "IP Address" is defined as a unique number assigned to every computer directly connected to the Internet (for example 173.18.96.176). Each computer connected to the Internet is assigned a unique IP address while it is connected. The IP address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP address is only assigned for the duration of that on-line session.

f.     The term "ISP" (Internet Service Provider), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

g.     The term "web site" consists of text pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from the web servers to various web clients via Hyper-Text Transport Protocol.

h.     "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

i.     A provider of "Electronic Communication Service" ("ESP"), as defined in 18 U.S.C. § 2510(15), is any service that provides to users thereof the ability to send or receive wire or electronic communications. For example, "telephone companies and electronic mail companies" generally act as providers of electronic communication services. *See* S. Rep. No. 99-541 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3568.

5.     In my training, experience, and research, I have learned that ProtonMail provides electronic mail ("email") access to the public using protonmail.com as their main domain name. ProtonMail allows subscribers to obtain email accounts, such as the illinoispatriot@protonmail.com account referenced in Attachment A. Subscribers obtain

4

an account by registering with ProtonMail. ProtonMail is owned, maintained, controlled, and operated by ProtonMail, Proton Technologies AG., an electronic mail company headquartered at CH-1228 Plan-les-Ouates, Geneva, Switzerland.

6.      ProtonMail messages are stored on ProtonMail servers in encrypted format. They are also transmitted in encrypted format between ProtonMail servers and user devices. Messages between ProtonMail users are also transmitted in encrypted form within the ProtonMail secure server network. Because data is encrypted at all steps, the risk of messages being intercepted is minimal.

7.      ProtonMail's zero access architecture means that data is encrypted in a way that makes it inaccessible to the provider. Data is encrypted on the client side using an encryption key to which the provider does not have access. This means ProtonMail does not have the technical ability to decrypt users' messages, and as a result, ProtonMail is unable to provide data in a usable format to third parties. ProtonMail also is also unable to conduct data recovery. If the user forgets his or her password, ProtonMail cannot recover the user's data. Thus, ProtonMail enhances privacy for its users.

8.      As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. The information stored in connection with an email account can indicate who has used

or controlled the account. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Additionally, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## DETAILS OF THE INVESTIGATION

9.    On August 5, 2017, at approximately 5:00 a.m., an explosive device was thrown through the window of the Dar Al Farooq Islamic Center (DAF), located at 8201 Park Avenue South, Bloomington, in the District of Minnesota. The device exploded while five individuals were inside the building; although no one was injured, the explosion caused extensive damage to DAF. After the explosion, FBI Minneapolis interviewed a witness who was present during the explosion. The witness stated he left the DAF after prayer, and while walking to his vehicle, heard glass breaking. The witness looked toward the noise and saw a man run from DAF to a dark-colored truck. The witness saw the truck quickly leave the parking lot. FBI Minneapolis collected video from DAF of the parking lot, which showed a dark truck leaving the parking lot of DAF just before the explosion.

6

10.     On November 7, 2017, at approximately 7:30 a.m., a secretary at the Women's Health Practice (hereinafter, the "Clinic") entered the Clinic located at 2125 S. Neil St., Champaign, in the Central District of Illinois. She found a broken window, glass on the floor, and an explosive device inside a surgical room with oxygen tanks. The Clinic offers medical services for women, including abortions.

11.     She contacted law enforcement authorities, and multiple agencies went to the Clinic, including the FBI, UIPD, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and the Champaign Police Department. Agents rendered the explosive device safe. The device consisted of a segment of PVC pipe with a plastic cap on one end and duct tape over the other end. The pipe contained a magnesium strip and a powder determined to contain thermite, a pyrotechnic compound. These factors led a bomb technician to conclude that the device was designed to burn.

12.     Around December of 2017, a confidential source (CS1) told the FBI that Michael B. Hari ("HARI") has guns and bomb-making material inside HARI's parents' home in Clarence, Illinois.[1]

13.     On January 27, 2018, a second confidential source (CS2)[2] provided information that three individuals - HARI, Michael McWhorter ("MCWHORTER"), and

---

[1] CS1 has no criminal history. CS1's stated motivation for providing the information was that CS1 did not want anyone to get hurt. The FBI has paid CS1 approximately $1,000 to date for the information provided.

[2] CS2 has a criminal history that includes convictions for possession of drug paraphernalia and cannabis in the late 1990s. In the early 2000s, CS2 was convicted for driving under the influence and misdemeanor assault. CS2 currently has a pending attempted assault charge. The FBI has paid CS2 $1,000 for the information provided.

Joe Morris ("MORRIS") – were responsible for the bombing carried out at the DAF

Mosque, in Bloomington, Minnesota, and the attempted bombing at the Women's

Health Practice in Champaign, Illinois. CS2 said CS2 obtained this information because

CS2 had worked for HARI, who recruited CS2 into a militia group known as the "White

Rabbits" that was led by HARI.

     14.     On or about January 27, 2018, CS2 saw illegal fully automatic firearms,

M4s, video jammers, and tannerite, which the militia group locked in a safe inside

HARI's office in Clarence, Illinois. CS2 also said that one night when CS2 was drinking

with MORRIS and MCWHORTER, MORRIS admitted throwing a black powder pipe

bomb at a mosque in Minnesota. MORRIS told CS2 that he made the pipe bomb and

that MCWHORTER threw it in the mosque. MORRIS claimed HARI was going to pay

them $18,000 for their participation in the Minnesota bombing. MORRIS later told CS2

that he made and placed the incendiary device at the Clinic in Champaign. MORRIS

complained to CS2 that it did not go off and MORRIS had no idea why. MORRIS told

CS2 that the truck, which was used to get away, was rented in Champaign, possibly at

Enterprise Rent-A-Car.

     15.     Records obtained from Enterprise Holdings show that HARI rented a

black Nissan Frontier crew cab truck from Champaign on July 27, 2017, with a

beginning mileage of 13,873. HARI returned the truck on August 6, 2017, the day after

the Minnesota bombing, with an ending mileage of 16,948. The round trip distance from

Champaign, Illinois to Bloomington, Minnesota is approximately 1,040 miles.

16.     On February 13, 2018, CS1 provided pictures of items in the garage at

HARI's parents' home in Paxton, to which HARI has access. Included in the pictures

was a photograph of the Anarchist's Handbook, which includes instructions for the

creation of thermite. The photographs also show tools, such as a drill, that may be used

in the creation of a pipe bomb.

17.     On February 19, 2018, a tip was provided by email to the Bureau of

Alcohol, Tobacco, Firearms and Explosives' (ATF) anonymous tip-line indicating

explosive devices were contained in a suitcase and one gray bag in a shed at the back of

the property located in Clarence, Illinois. The tip stated:

> this is a possible terrorism threat i know a man named [J.O.] he is
> about 30 years old he is always talking about getting the niggers and
> here lately he said he is really going to get them he has been buying a
> lot of wierd chemicals like nail polish remover and battery acide and i
> thought he was making meth because he has science things like
> beakers too but he said no it is for a nigger schredder and he has four
> big black suitcases in his shed and a little greay bag and they are full of
> stuff like pipes and caps and wires nails and he told me to watch the
> news this week he lives at [Address in Clarence, Illinois] his house is a
> brown and yellow trailer and a garage put together and he has a lot of
> sheds but the one with that stuff in it is the red shed with white boards
> that is far in the back of his yard i know his kid and we hang out but i
> am afriad someone will get hurt if someone doesnt do something i also
> sent something about it to the newspaper so if you just blow it off like
> you did that school schooter kid in florida the press will know you got
> a tip so you better check it out just saying you did screw up once and
> he has a rebel flag on a pole in front of his house there is lots of them in
> town but his is the brown and yellow house on the north end of main
> road he also has kids and he just got out of jail [J.O.] and you better
> check it out because i thin it is bomb stuff for sure.

9

18.     An FBI forensic examiner determined that the IP address from which the above referenced email originated was a proxy, which is generally intended to ensure anonymity and make difficult any trace to the true sender.

19.     On the same day, the FBI, UIPD, and Ford County Sheriff's Department, went to J.O.'s residence in Clarence, Illinois. Agents searched the residence pursuant to J.O.'s consent and found multiple explosive devices in a shed at the back of J.O.'s residence. J.O. and his wife were very cooperative during the search of the premises. Both J.O. and his wife said they did not know anything about the devices that were discovered, and said they believed HARI was responsible for placing the devices on his premises.[3]

20.     One of the devises agents found at J.O.'s residence was a pipe bomb attached to a small green propane tank. A robot took photographs of the device and rendered it safe. CS1 said that, in approximately 2008, HARI had possession of multiple green propane tanks that looked "very similar to the tanks HARI had possession of in 2008."

21.     On February 27, 2018, FBI agents canvassed Clarence, Illinois to find any witnesses who may have knowledge of the devices that were discovered on J.O.'s

---

[3] At that time, HARI faced criminal charges in Ford County for an alleged assault on J.O. in June 2017. The incident involved a fight where HARI is alleged to have held J.O. down and pointed an air soft gun to J.O.'s head until police arrived. At that time of the "tip," HARI had a hearing scheduled on March 13, 2018, with a trial on April 9, 2018.

property. During the canvass, multiple people were interviewed, including

MCWHORTER's brother (hereafter, "the brother"). The brother said that a few days

earlier, HARI and MORRIS had arrived at his residence in a Ford Taurus and dropped

off a bag. The brother consented to a search of his residence. During the search, agents

found four shotguns and four assault rifles inside a camouflage bag. They also found a

black hard-gun case, a green plate carrier with soft armor, and a bandoleer containing

multiple 12-gauge bullets. An ATF agent later determined that three of the four assault

rifles ("ARs") field-tested as fully automatic and met the definition of a "machinegun,"

as defined by 18 U.S.C. § 921(a)(23) and 26 U.S.C. § 5845(b).

22.     Agents asked the brother why HARI and MORRIS brought the guns to his

house. The brother answered that HARI told him, "the police will want to come talk to

me, can I keep them here until I speak to them?" MORRIS told the brother that HARI

did not want to have the guns when the police come to speak to him. The brother said

he placed the shotguns in the case when HARI and MORRIS arrived, and admitted his

DNA would be on the shotguns. The brother thought HARI and MORRIS dropped the

weapons off on February 20, 2018, between 2:30 p.m. to 3:30 p.m., "before the kids got

off school." MORRIS carried all the weapons up the stairs.

23.     While law enforcement officers were interviewing the brother on his front

porch, HARI arrived driving a gray Mazda. HARI identified himself as "Mike Hari."

Agents asked HARI if they could help him. HARI said he wanted to speak to the

brother. Agents told HARI that they were speaking to the brother and that he could

11

come back when the conversation ended. HARI then asked the brother where "EJ" was. ("EJ" is the nickname of ELLIS MACK who is the stepson of MCWHORTER). The brother said that MACK was at MCWHORTER's house down the road. HARI looked into the front door of the brother's residence for a few seconds and then left in the gray Mazda. FBI Special Agent Joel Smith watched HARI drive to MCWHORTER's residence.

24.     The brother also said that, approximately one month earlier, he, HARI, and MORRIS were at HARI's office in Clarence when HARI asked, "do you want to see some science stuff?" The brother said HARI poured some fluid in the snow on the doorstep of the office, then placed a piece of "a braided wire [approximately] one inch in length, that was flat" inside the fluid. After a few minutes, the metal and fluid began to glow and eventually ignited for approximately 2-3 minutes. The brother said the fluid was contained in a "brake fluid bottle" approximately 8-12 inches high.

25.     According to the brother, on another occasion approximately one month ago, HARI, MORRIS, and he were again at the office when HARI pulled out two containers from the office. The brother described the containers as "clear" and "about the size of a coffee can." Both containers were approximately one third full. One container had a white powdery substance inside, while the other container had a red powdery substance inside. The brother did not know what either of the powdery substances contained. According to the brother, HARI took a scoop of the red powder and poured it in a burning fire, hoping it would ignite, but nothing happened. When

12

nothing happened, HARI said, "Oh, that didn't do anything." MORRIS said the

powdery substances should "burn really hot."

26.    According to the brother, a couple days after the incident with the

powder, he was again at the office with HARI and MORRIS. The brother said he saw

HARI and MORRIS cleaning some of the same weapons that were taken from his house

by law enforcement on February 27, 2018. When the brother saw the weapons, he said

"those look neat." HARI responded, "Don't tell anyone I don't want a lot of people

knowing I have them." HARI said, "They are lightly modified, two are semi-auto and

one is fully auto."

27.    On February 28, 2018, Agent Smith interviewed MCWHORTER's wife and

her minor daughter (hereafter, "the wife" and "the daughter"). According to the wife,

her last communication with MCWHORTER was on February 27, 2018, when

MCWHORTER called from MACK's phone. The wife said she told MCWHORTER that

the FBI only wanted to talk to him and asked MCWHORTER where he was.

MCWHORTER replied, "I can't tell you, I love you" and then ended the call.

28.    The daughter said that on February 27, 2018, during the consent search of

MCWHORTER's brother's house, she was at home. She said HARI was also at the

house and that he was on the phone with MCWHORTER for approximately 2-3

minutes. HARI told the daughter, "If the FBI wants to talk to you, tell them you want to

talk to a lawyer." HARI then stated, "I will wait here to find out what is going on down

the road," referring to the search at the brother's house. The daughter also said HARI

13

kept going in and out of the house. She said HARI eventually pushed MACK out the door saying, "Let's go for a ride." The daughter believed HARI appeared to be in a rush and that MACK appeared as though he did not want to go.

29.     On March 10, 2018, Special Agent Smith interviewed MCWHORTER. MCWHORTER initially denied having any knowledge of any type of explosive or incendiary type of devices. MCWHORTER said he was aware of four shotguns and four assault rifles that belonged to HARI. MCWHORTER described one of the assault rifles as "really small" and said three rifles had aluminum lowers. MCWHORTER also said three of the rifles were illegal; two were "full auto" and two were "way too damn short." MCWHORTER said the rifles belonged to HARI and that HARI bought all the pieces to build the assault rifles. MCWHORTER said he assisted in drilling an AR to enable it to shoot fully automatic. HARI instructed MCWHORTER on how to make the alterations. The ARs were drilled at HARI's parents' house in the garage. HARI, MORRIS, MCWHORTER, and MACK knew the weapons were fully automatic because they all fired the weapons outside of Paxton. According to MCWHORTER, the weapons had been stored in a vault in HARI's office in Clarence. MCWHORTER said law enforcement would find his fingerprints on the ARs. MCWHORTER admitted to bringing the ARs and shotguns to the brother's house in a camouflage bag and a black plastic case. MCWHORTER's description of the bags and weapons matched the description of what law enforcement officers seized from the brother's house on February 27, 2018.

14

30.     MCWHORTER admitted to his participation in the attempted bombing of

the Clinic in Champaign on November 7, 2017. MCWHORTER said HARI, MORRIS,

and MCWHORTER were in a gray Dodge Ram 2500, which HARI rented at Enterprise

Rent-A-Car in Champaign. (Records obtained from Enterprise confirmed that HARI

had rented a grey Dodge Ram during the time the pipe device was thrown into the

window of the Clinic.) MCWHORTER said the thermite device was made in Clarence

before the attempted bombing. MCWHORTER said HARI made the device out of a

white PVC pipe. MCWHORTER said "in the middle of the night" MORRIS was

dropped off; that MORRIS smashed the window and threw the device in the window at

the practice; and that they picked MORRIS up north of the practice. MCWHORTER said

they would sometimes use a magnesium strip to set off a thermite device. According to

MCWHORTER, the magnesium strip sets off the thermite device a lot faster "than a

normal wick would." He said the magnesium strip looks like tape, but it is metal,

"blackish grey in color."

31.     MCWHORTER also admitted to his participation in the bombing of DAF

on August 5, 2017. MCWHORTER said MCWHORTER, HARI, and MORRIS drove to

Minnesota in a charcoal gray Nissan Frontier, which HARI rented from Enterprise Rent-

A-Car in Champaign. According to MCWHORTER, HARI picked up MORRIS and

MCWHORTER from their homes prior to departing Illinois. HARI, MCWHORTER, and

MORRIS each had specific roles for the bombing. HARI was the driver, MORRIS was

responsible for smashing the window in, and MCWHORTER was responsible for

15

throwing the bomb in the window. MCWHORTER claimed it was HARI's idea to target DAF. MCWHORTER said they did not intend to kill anyone, but they wanted to "scare them out of the country" (referring to Muslims), because they push their beliefs on everyone else. MCWHORTER also said they committed the bombing mainly to "show them hey, you're not welcome here, get the fuck out." MCWHORTER said MORRIS smashed the window in with a sledgehammer. MCWHORTER described the device as a "huge ass black powder bomb." The device was approximately 18"-24" tall. MCWHORTER initially said it was made out of PVC, but then stated it was probably metal. MCWHORTER admitted igniting the device with a green fuse. MCWHORTER said he didn't want to be anywhere near it when it went off. MCWHORTER said after he threw the bomb inside he saw a man, who looked "directly at him." MCWHORTER said this occurred at approximately 3:00 a.m. to 4:00 a.m. MCWHORTER said, "we were long gone before it went off" (referring to the bomb exploding).

32.      MCWHORTER also admitted that he, HARI, MORRIS, and MACK participated in a home invasion in Indiana. MCWHORTER was unsure of the exact date but it was after December 2017. MCWHORTER stated that the group believed the home was of a Hispanic drug dealer that could be robbed of the cash inside. He said the group was armed with the automatic weapons and posed as police officers executing a search warrant. MCWHORTER stated they did not find any cash in the residence. In addition, MCWHORTER also admitted the group had attempted to rob three Wal-Marts in Illinois.

16

33.    MCWHORTER also admitted that he, HARI, and MORRIS planted the explosive devices on J.O.'s property. According to MCWHORTER, the motivation was to get J.O. in trouble prior to the court hearings for HARI. MCWHORTER said that HARI was responsible for sending the "tip" to the ATF.

34.    MCWHORTER also said that prior to a "mission" (a reference to acts like those described above), HARI would call MCWHORTER's phone or stop over in person to arrange a meeting at the office. MCWHORTER stated that prior to traveling to Champaign for the attempted bombing at the Clinic, HARI, MCWHORTER, and MORRIS did not bring their phones. They each turned their phones off and put them in a "Faraday bag" to block the signal. MCWHORTER advised that prior to any mission, they would turn their phones off and then only turn them back on when they got back to the office when they felt like they were safe enough and far enough away. That way there was no record of them going anywhere.

35.    HARI, MORRIS, and MCWHORTER were arrested on March 13, 2018. MCWHORTER was again interviewed after he waived his rights pursuant to Miranda. At that time, he further told agents that HARI talked about "higher ups" and identified two people HARI identified as "Ben Lewis" and "Congo Joe." MCWHORTER said that, although HARI had cellphones, HARI either had people call him back, or when HARI dialed, he seemed to add extra digits to get through to someone. MCWHORTER stated that HARI has a Proton email account that masks the IP address he uses.

17

36.     Additionally, MCWHORTER described a "mission" whereby HARI, MORRIS, AND MCWHORTER traveled to near Effingham in the Southern District of Illinois to attempt to damage railroad tracks by use of an incendiary device. MCWHORTER placed jumper cables on the tracks near a crossing to cause the crossing gate to malfunction. HARI then used an incendiary device to damage the tracks. In connection with this sabotage, MCWHORTER believed that HARI sent a message to the owner of the railroad tracks through the illinoispatriot@protonmail.com account demanding the payment of a substantial sum of money to prevent additional sabotage in the future. The FBI has confirmed that this railroad track damage occurred and that an extortion demand was sent via electronic mail to the owner of the railroad.

37.     On March 15, 2018, CS2 told agents that CS2 had established a Proton Email account to converse with HARI and MORRIS using encrypted emails. CS2 advised that HARI's Proton email address was "illinoispatriot@protonmail.com."

38.     On March 28, 2018, agents interviewed MORRIS in the presence of his defense counsel pursuant to a cooperation agreement with the United States. The agreement conferred conditional direct use immunity on MORRIS's statements made pursuant to the agreement, but also informed MORRIS that the United States would be free to make indirect, or derivative, use of his statements. During the interview, MORRIS said that HARI used a Proton email account with the e-mail address "illinoispatriot@protonmail.com." MORRIS said there were approximately 13 other militia groups similar to the White Rabbits and that HARI would use the

18

illinoispatriot@protonmail.com account to talk to other militia members, as well as the "higher ups" from whom they would receive their missions. HARI told MORRIS that if HARI ever got arrested, MORRIS should assume control over the illinoispatriot@ protonmail.com account. HARI gave MORRIS the password for the illinoispatriot@ protonmail.com account. During the interview, MORRIS told agents the password for the illinoispatriot@protonmail.com account.

39.     Based on the foregoing, I believe that HARI used the illinoispatriot@ protonmail.com account, including its encrypted features and its foreign location, to further his criminal activity and to attempt to prevent detection of his criminal online activity and conspiratorial contacts from law enforcement.

40.     The information in the illinoispatriot@protonmail.com account is currently believed to be stored on ProtonMail servers in Switzerland. It is my understanding that the Fourth Amendment's warrant requirement does not generally apply to locations outside the territorial jurisdiction of the United States, *see United States v. Stokes*, 726 F.3d 880, 890-93 (7th Cir. 2013), and that a warrant issued under Rule 41 of the Federal Rules of Criminal Procedure would not authorize the search of a server located in Switzerland under these circumstances. *See also United States v. Verdugo-Urquidez*, 494 U.S. 259, 274 (1990) (describing a warrant issued by a United States magistrate as "a dead letter outside the United States"). In addition, as described above, MORRIS has authority to access the illinoispatriot@protonmail.com account and has provided the FBI with account information and permission to access the

illinoispatriot@protonmail.com account. Therefore, while the FBI might already have all necessary authority to examine information associated with the illinoispatriot@ protonmail.com account, I seek this warrant out of an abundance of caution to be certain that an examination of information from the illinoispatriot@protonmail.com account downloaded to computer media in possession of the FBI in the Central District of Illinois will comply with the Fourth Amendment and other applicable laws.

## APPLICATION

41.    Based on the foregoing, I believe there is probable cause that the illinoispatriot@protonmail.com account contains items that constitute evidence of the commission of an offense in violation of Title 18, United States Code, Sections 844(i) (Arson and Attempted Arson), 844(h) (Use of an Explosive), 924(c) (Using a Destructive Device During a Violent Crime), 1951 (Conspiracy to Commit Robbery and Extortion), 922(o) (Possession of a Machinegun), 371 (Criminal Conspiracy), 241 (Conspiracy Against Rights), 247 (Damage to Religious Property), and 248 (Damage to a Reproductive Health Clinic), and that those items will be found in the Subject Account Information at the time that the warrant is executed.  Those items are more specifically described in Attachment B, which is attached hereto and specifically incorporated herein by reference.

## CONDITION REQUIRED PRIOR TO EXECUTION

42.     As noted above, upon information and belief, the information contained in the illinoispatriot@protonmail.com account is believed to be located on ProtonMail servers in Switzerland.

43.     As noted above, during his March 28, 2018, interview, MORRIS informed agents that Hari had provided him with access to the illinoispatriot@protonmail.com account; MORRIS further provided agents with the username and password for the illinoispatriot@protonmail.com account.  Using these account details, agents plan to access the illinoispatriot@protonmail.com account and use an automated tool to download information from the account onto computer media in possession of the FBI located in the Central District of Illinois.

44.     Following the planned download of information from the illinoispatriot@ protonmail.com account onto computer media in possession of the FBI located in the Central District of Illinois, I am seeking permission to search the Subject Account Information as described in Attachment A and seize the items and information described in Attachment B.

45.     *Manner of execution.*  Because this warrant seeks only permission to examine information on computer media in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

21

## CONCLUSION

46.    Based on the above information, I respectfully submit that there is probable cause to believe that evidence and instrumentalities of violations of Title 18, United States Code, Sections 844(i) (Arson and Attempted Arson), 844(h) (Use of an Explosive), 924(c) (Using a Destructive Device During a Violent Crime), 1951 (Conspiracy to Commit Robbery and Extortion), 922(o) (Possession of a Machinegun), 371 (Criminal Conspiracy), 241 (Conspiracy Against Rights), 247 (Damage to Religious Property), and 248 (Damage to a Reproductive Health Clinic), specifically those items more fully set forth in Attachment B of this affidavit, which is attached hereto and specifically incorporated herein by reference, currently are located in the illinoispatriot@protonmail.com account and will be located in the Subject Account Information in the Central District of Illinois at the time that the warrant is executed. The Subject Account Information is more fully described in Attachment A, which is attached hereto and specifically incorporated herein by reference.

## REQUEST FOR SEALING

47.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, *i.e.*, post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

FURTHER AFFIANT SAYETH NOT.

s/Barbara Robbins

BARBARA ROBBINS, Special Federal Officer
Federal Bureau of Investigation
Champaign, Illinois

Subscribed and sworn to before me
me this 4th day of May 2018.
s/Eric I. Long

ERIC I. LONG
United States Magistrate Judge

23